DUPREE et al. v. FIRST NAT. BANK OF MERKEL.

(Court of Civil Appeals of Texas. El Paso. March 28, 1912. Rehearing Denied April 24, 1912.)

1. JUDGMENT (§ 673*)—RES JUDICATA—PARTIES CONCLUDED.

A judgment in an action by a chattel mortgagee against the mortgagor and his wife and a third person to whom the mortgagee had contracted to sell the chattels, which decrees that the third person go hence without day and recover his costs, and determines the rights of the remaining parties, including the right to the proceeds of mortgaged chattels, which had been paid into court by the third person, does not determine the rights of the third person under his contract with the mortgagee, and is not res judicata in an action on the contract.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1187; Dec. Dig. § 673.*]

2. BANKS AND BANKING (§ 260*)—NATIONAL BANKS—POWERS.

A national bank holding a mortgage on cattle worth much less than the debt secured

thereby may reduce the cattle to money and obtain the highest price therefor, and may contract to obtain from the mortgagor the title and to resell the same to a third person, and, where the mortgagor does not voluntarily surrender the cattle, the mortgagee may foreclose and buy the same in at an execution sale, applying its bid on the debt.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 977–978, 983, 984, 986½–990; Dec. Dig. § 260.*]

3. BANKS AND BANKING (§ 262*)—NATIONAL BANKS—AUTHORITY OF AGENTS.

Where a national bank authorized an agent to contract for the sale and delivery of cattle subject to a mortgage to the bank, and the bank contended at all times that specified cattle were included in the mortgage, a contract by the agent for the sale of such cattle to a third person was within the agency, in the absence of any knowledge on the part of the third person of any limitation on the agent's authority.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig § 262.*]

4. BANKS AND BANKING (§ 262*)—ACTS OF AGENTS—RATIFICATION.

Where the president of a national bank obtained actual authority from the bank to represent it in specified negotiations, and the president ratified a contract made by an agent with a third person respecting such transaction, the bank ratified the act of the agent.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. § 262.*]

5. SALES (§ 417*) — BREACH OF CONTRACT — EVIDENCE.

Where a mortgagee of cattle contracted to sell and deliver all of the cattle to a third person, and the evidence showed the number of cattle and their market value, and the mortgagee failed to perform its part of the contract, there was sufficient evidence for an award of damages sustained by the third person of the difference between the full value of the cattle and the price at which the mortgagee had contracted to sell them.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1173; Dec. Dig. § 417.*]

6. SALES (§ 412*)—CONTRACTS—BREACH—DEFENSES.

One contracting to sell all the cattle of a specified brand, who asserts that it was understood that he should be required to deliver only the cattle subject to a mortgage, must present the same as a defense by proper pleading.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1165; Dec. Dig. § 412.*]

Error to District Court, Taylor County; Thomas L. Blanton, Judge.

Action by Ed Dupree and another against the First National Bank of Merkel. There was a judgment for defendant, and plaintiffs bring error. Reversed and remanded.

Royall G. Smith, of Colorado, Tex., and Kirby & Davidson, of Abilene, for plaintiffs in error. C. D. Mims, of Merkel, Hardwicke & Hardwicke, of Abilene, and Theodore Mack, of Ft. Worth, for defendant in error.

HIGGINS, J. Plaintiffs in error sued defendant in error for damages arising from the alleged breach of a contract for the sale and delivery of 168 head of cattle referred to in this opinion as the "A T" cattle.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

Defendant in error is a banking corporation, engaged in the banking business at Merkel, incorporated under the national banking laws of the United States. One Oscar Wilson was heavily indebted to the bank, the indebtedness being secured by a chattel mortgage upon cattle owned by him, in various brands, upon a ranch controlled by him in Sterling county. The "A T" cattle were not specifically described in the mortgage, but the same contained a general clause covering all cattle owned by Wilson on said ranch. The indebtedness being greater than the value of the security, the bank was taking steps to reduce the security to money, and apply the same to the payment of the Wilson debt, and, in furtherance of this purpose, the bank, acting by and through its agent, W. A. Coggin, entered into a written contract with Ed and Geo. Dupree, plaintiffs in error, by the terms of which the bank sold to the Duprees "all cattle in the 'Y' and other brands now located on what is known as the Logan Ranch, in Sterling county, Texas, said cattle numbering in total about 1,000 head, and consisting of cows, yearlings, and bulls." The bank was claiming a mortgage upon all of the cattle upon the ranch, but at the time of the execution of the contract Coggin stated that the wife of Wilson might claim the "A T" cattle, and at his instance a clause was inserted in the contract in regard to the "A T" cattle as follows: "All cattle in the 'A T' brand now located on the ranch mentioned in this contract are subject to purchase by said parties of the second part from the parties of the first part at the same rate and terms as the cattle contracted for herein now in the 'Y' and other brands, if the parties of the first part can procure same from their present owners." After the execution of this contract, the Duprees went to Wilson's ranch, and all the cattle thereon were delivered to the Duprees except 168 head in the "A T" brand, which Wilson refused to deliver unless check in favor of his wife was given to cover the purchase price thereof, claiming that these cattle belonged to his wife as her separate property, and were not subject to the mortgage which he had executed in favor of the bank. By mutual agreement of the Wilsons and Duprees, however, 67 head of the "A T" cattle were delivered to the Duprees, who sold the same for the sum of $1,292, and the money was deposited with the Cassidy Southwestern Commission Company to be paid to whomsoever it might finally be determined the 67 head of cattle belonged. At the time of the execution of the above mentioned contract, the Duprees paid $500 as earnest money and part payment for the cattle, and subsequently, it appearing that the correct amount as part payment had not been paid, the Duprees paid to the bank the further sum of $55.80. Draft for this amount was sent to Geo. S. Berry, president

of the bank, with letter reading as follows: "I note from your draft on the Cassidy-Southwestern Commission Company that the boys did not figure on enough margin on the remaining 168 head of cattle. They only figured $45.00 when it should be $100.80. The draft has been paid by the Cassidy-Southwestern Commission Co. and according to the figures, we are still due you $55.-80, for which you may make draft on us through the Colorado National Bank, Colorado, Texas. This amount, you understand, will apply as a margin on the 168 head of cattle." The 168 head of cattle referred to in the above letter were the "A T" cattle which the bank failed to deliver to the Duprees, upon which failure this action for damages is based. Subsequent to the refusal of Wilson to deliver the "A T" cattle the president of the bank, Geo. S. Berry repeatedly stated to the Duprees that the bank mortgage covered these cattle, and that they would foreclose thereon and acquire the same and deliver them under the Dupree contract, and the bank, acting through Berry, endeavored to secure from Mr. and Mrs. Wilson a bill of sale for the cattle so that they might be delivered to the Duprees. The bill of sale to be signed by the Wilsons conveying the same was prepared and was given to Ed Dupree by Berry for the purpose of obtaining the signatures of the Wilsons, and Dupree went to see them for that purpose, but they refused to sign the same. Thereupon the bank filed suit against Wilson and his wife in the district court of Taylor county in cause No. 2,166 upon the indebtedness of the said Oscar Wilson and for foreclosure of its mortgage lien upon the "A T" cattle. In this suit Oscar Wilson and his wife, Edith P. Wilson, Mrs. Clifford, and F. R. Stewart were made parties defendant; it being alleged that Mrs. Wilson was asserting some claim or title to the "A T" cattle, and that Stewart and Mrs. Clifford were asserting some claim under old mortgages upon the same. The said W. A. Coggin was appointed by the court as receiver of the cattle and other property upon which a foreclosure was sought.

The bank amended its original petition, and alleged that the Wilsons, being under the impression that the bank would pay Mrs. Wilson for the 168 head of "A T" cattle, has left same in possession of the Duprees, Wilson claiming that those cattle were not included in the bank's mortgage, and it was alleged that the bank did have a mortgage lien on all of the cattle, including the "A T." It was further alleged in this amended petition that the Duprees, being under the impression that they were authorized to sell the "A T" cattle, had sold 67 head thereof for the sum of $1,292, which amount had been deposited with the Cassidy Southwestern Commission Company to be paid to whomsoever it might be judicially determined was thereto entitled; that is,

146 S.W.—39

if it was held that the bank's mortgage covered the "A T" cattle, then the same was to be applied to the payment of the bank's debt, otherwise, it was to be paid to whomsoever the cattle belonged to, and for the purpose of disposing of their rights as to this $1,292 the Duprees and the commission company were made parties to the suit. The Duprees and the commission company paid the said sum of money into court, and thereafter in said cause a judgment was rendered by the terms of which Mrs. Clifford was dismissed from the suit and discharged. It was then recited that the Duprees and the commission company "having paid into the hands of the receiver of this court under orders of the court the sum of $1,292.00, the proceeds of the sale of certain of the 'A T' cattle, it is ordered that they and each of them go hence without day, and recover of plaintiffs their costs." The First National Bank of Sterling City having been made party defendant, and having disclaimed any interest in any of the property which it was alleged they were claiming, it was thereupon dismissed. The judgment then recited: "And thereupon came on to be heard the issues as between the other parties hereto, and the court, having heard the evidence, finds and adjudges as follows." The judgment then proceeded to decree judgment in favor of the Merkel bank against Wilson for its debt, and it was further decreed and found that in May, 1904, Oscar Wilson sold certain of the "A T" cattle to his wife, who thereby became the owner thereof as her separate property; that the said cattle so conveyed to Mrs. Wilson were subject to a mortgage lien in favor of the said Stewart; that thereafter the bank's mortgage, dated December 28, 1907, was executed by Wilson to the bank, whereby the bank acquired a lien on all of the "A T" cattle except the ones conveyed to Mrs. Wilson in May, 1904. Mrs. Wilson was decreed the title and possession of all the cattle in the "A T" brand then on hand which were transferred to her in May, 1904, but the spring calves of the year 1904 of the cattle decreed to Mrs. Wilson were decreed not to belong to her. Stewart was adjudged to have a lien on all the cattle decreed to Mrs. Wilson. It was further adjudged that the 1908 calves of Mrs. Wilson's cows were community property of Wilson and his wife; but that they were not subject to the plaintiff's mortgage, but were subject to the Stewart mortgage. It was decreed that the mortgage of the Merkel bank covered and included all of the "A T" cattle, excepting only those conveyed to Mrs. Wilson in May, 1904, and excepting only the calves of the year 1908 of Mrs. Wilson's cows, which calves were adjudged subject to the Stewart mortgage. The receiver was directed to segregate and deliver to Mrs. Wilson all of the cattle adjudged to her in the "A T" brand, subject, however, to the Stewart lien therein fore-

closed, with orders to the clerk to issue order of sale therefor whenever requested by the said Stewart. As to the rest of said "A T" cattle which were adjudged subject to the lien of the plaintiff bank, the receiver was ordered to sell the same, and the proceeds to be applied to the payment of the bank's debt. The court then further found that by agreement of plaintiff and Wilson and his wife 67 head of the "A T" cattle had been sold by the Duprees and proceeds deposited with Cassidy Southwestern Commission Company, and the proceeds of $1,292 were then in the hands of the receiver, of which amount the sum of $1,166 was the proceeds of the cattle subject to the bank's lien, and the remaining $126 was proceeds of cattle of Mrs. Wilson's subject to the Stewart lien, and it was therefore ordered that $1,166 of this money be applied to the payment of the bank's debt and the $126 paid to Stewart. It appears that the receiver did not obey the instruction of the court to segregate and set apart and deliver to Mrs. Wilson the cattle in the "A T" brand adjudged to be her separate property out of the 101 head in his hands upon which the Stewart and bank's liens were foreclosed, but by agreement Mrs. Wilson's cattle, together with the other "A T" cattle in the receiver's hands subject to the bank's lien, were all sold together for $2,000, of which amount $700 was paid to Stewart to be applied upon his debt. At the sale by the receiver of these "A T" cattle, the same were purchased by Barbee & Douglass. Thereafter the Duprees filed this suit, alleging a breach of the contract for the sale and delivery of the "A T" cattle, and praying judgment for their damages therefrom resulting.

Defendant bank filed an answer setting up the following defenses: First, that the contract sued upon was ultra vires; second, that Coggin, who had executed the same in its behalf as agent, had no authority to execute the same in so far as the same concerned the "A T" cattle; third, that the clause in regard to the "A T" cattle was inserted by mutual mistake, as it was not intended by said contract that the bank should bind itself to sell and deliver to the Duprees any cattle except such as would be voluntarily surrendered by Wilson to the bank as subject to the bank's mortgage; fourth, that the judgment rendered in said cause No. 2,166 was res adjudicata of the rights of the Duprees under the contract declared upon, precluding and estopping them from asserting the rights now declared upon. The pleas of ultra vires, Coggin's lack of authority to execute the contract, and mutual mistake were verified by affidavit. The plea of mutual mistake was not insisted upon.

By supplemental petition the Duprees alleged that Coggin, who acted for the defendant in the execution of the contract of

sale, in so doing acted within the scope of his apparent authority, upon which plaintiffs had relied, and that the bank was estopped to deny his authority. It was further alleged that, if he did not have such authority, the bank, after the execution of the contract, with the full knowledge of all the facts, acting by and through Berry, its president, who was vested with plenary power to dispose of the Wilson cattle, had ratified, confirmed and approved the contract made by Coggin, and had promised plaintiffs that the bank would get the "A T" cattle if a lawsuit was necessary to enable it to do so, and that the defendant bank further ratified the contract by the acceptance of a margin of $100 on the purchase price of the "A T" cattle. Other matters specially pleaded in this supplemental petition it is unnecessary to state.

Upon trial before a jury the court peremptorily instructed a verdict for the bank, and this action upon part of the court is here now presented for review.

We are of the opinion that the court erred in giving this peremptory instruction, that a prima facie case was made by the evidence of the plaintiffs in error, and that it should have been submitted to the jury for their determination.

[1] The plea of res adjudicata is wholly without merit, and is not seriously insisted upon by defendants in error in their brief. We have carefully examined this plea, and are of the opinion that the Duprees are not precluded by the judgment from asserting any of their rights under the contract declared upon. The statement of facts contains a summary of the pleadings and the judgment rendered in cause No. 2,166 and a certified copy of the judgment is attached to and made part of the defendants' answer. In the statement above made, we have quoted liberally from the judgment rendered, and it will be noted that in the very second paragraph of the judgment it was decreed that the Duprees go hence without day and recover their costs, and the judgment upon its face shows that the remainder of the decree had no reference whatever to any rights of the Duprees, because it is recited: "And thereupon came on to be heard the issues as between the other parties hereto [meaning the Wilsons, Stewart, and plaintiff bank], and the court, having heard the evidence, finds and adjudges as follows." In no subsequent portion of the judgment is there the slightest hint that any right whatever of the Duprees was undertaken to be adjudicated. It is therefore clearly apparent that none of the rights of the Duprees under the contract here sued upon were disposed of by this judgment, either directly or incidentally, and the same cannot be considered as in any wise precluding them from now asserting those rights. It is true the judgment decrees that a part of the proceeds of the 67 head of cattle which had been paid into court by the Duprees and Cassidy Southwestern Commission Company was subject to the bank's debt, because a part of the 67 head of cattle was subject to the bank's lien and the remaining part of the cattle subject to the Stewart lien, and it therefore orders a part applied to the payment of the bank's debt and a part applied to the payment of the Stewart debt, but it in no wise has reference to the rights of the Duprees under the contract of sale. Indeed, no rights of the Duprees under that contract could have been properly litigated or adjudicated in cause No. 2,166, as those rights were wholly foreign to the issues involved in that suit.

[2] As to the contention that the contract with the Duprees for sale and delivery of the cattle was unenforceable because the bank had not the power under its charter to execute and to make the same, it may be remarked that state and national banking corporations are vested with ample power to make such contracts relating to property lawfully held by them as security as may be necessary to enable the corporation to reduce the security to money, and, in furtherance of this purpose, they necessarily have the authority to deal freely with the security and make such contracts with reference to its disposal as in the judgment of its officers may be deemed necessary or expedient and which will enable the corporation to dispose of the security to the best possible advantage. In the instant case it appears that the Wilson debt to the bank was much greater than the value of the cattle upon which they were claiming a mortgage lien to secure its payment. Under such circumstances, the bank not only had the right, but it was its duty, to reduce its security to money, and to obtain the highest price therefor obtainable. The bank's debt being far in excess of the value of the cattle upon which they had a lien, they could safely and lawfully, if it saw fit to do so, contract to obtain from Wilson the title to the cattle and to resell the same to the Duprees, and, if Wilson did not voluntarily surrender the cattle, it was their duty to institute foreclosure proceedings and buy the same in at the execution sale, applying their bid upon their debt. We think the contract one which the bank might lawfully make for the purpose of obtaining from its security the greatest amount possible to be applied upon the indebtedness which it held against Wilson.

[3] Neither is the contention well taken that W. A. Coggin was without apparent authority to execute the contract. It is plainly apparent that he was authorized by the bank to contract for the sale and delivery of the Wilson cattle, subject to the bank's mortgage, and the bank was contending and at all times contended that all of the "A T" cattle were subject to its mortgage. It appears that the cattle upon

the Wilson ranch were in various brands, and the only limitation upon the authority of Coggin to dispose of the cattle, according to 'the contention of the bank, is as to the "A T" cattle, and there is not the slightest intimation in the testimony to affect the Duprees with notice of any limitation upon Coggin's authority to contract for the sale of the "A T" cattle. Indeed, there is no testimony whatever offered by the defendant bank to support its plea. of want of authority in Coggin to execute the contract, the bank contending that its sworn denial of Coggin's authority to execute the contract imposed upon the Duprees the burden of proving his authority, and that there is no testimony showing that he had actual authority. It may be that there is no testimony offered by the Duprees to show actual authority to execute the contract upon the part of Coggin, but from what has been said it is apparent that the testimony did raise the issue of whether or not Coggin in executing the contract was acting within the apparent scope of the authority conferred upon him so as to estop the bank from denying that he was so authorized.

[4] Upon the question of ratification, too, the evidence is ample, and, indeed, overwhelming in favor of a finding that the bank, after the execution of the contract, and with full knowledge of all of the facts, acting by and through its president Berry, ratified and confirmed the contract in so far as it related to the "A T" cattle. Berry, subsequent to the execution of the contract by Coggin, appears to have acted for the bank in all of the negotiations relating to the "A T" cattle, and it was through him that the bank received from the Duprees the remittance of $55.80 above referred to paid by the Duprees as a margin or part payment for the "A T" cattle, and there is nothing whatever in the record to indicate that Berry was not the duly authorized agent of the bank with authority to act for it in regard to the "A T" cattle. It may be that he was not vested with this authority, virtute officii as president of the bank alone, but, from the testimony as a whole, it is clearly apparent that he had actual authority from the bank to represent it in the negotiations with the Duprees and Wilson regarding the "A T" cattle.

[5] It is further insisted by the defendant in error that the court properly instructed a verdict for the defendant because the evidence furnishes no basis by which the jury could estimate the damage of the Duprees, in this: that in the judgment rendered in cause No. 2,166 it appears that there was an indeterminate number of the "A T" cattle which were decreed to be subject to the bank's mortgage, and an indeterminate number thereof subject to the Stewart mortgage, the receiver being instructed to segregate the cattle subject to the bank's mortgage and the cattle subject to the Stewart mortgage, that the receiver did not do this, but sold them all in bulk, and that the Duprees had not shown how many of these "A T" cattle were subject to the bank's mortgage. This contention loses sight of the fact that the bank had contracted with the Duprees to sell and deliver all of the "A T" cattle, and it is shown by the evidence how many there were of these cattle and what their market value was. This would make a prima facie liability upon the part of the bank to the Duprees for the difference between the value of all of the "A T" cattle and the price at which the bank had contracted to sell them to the Duprees, all of which is clearly shown by the testimony.

[6] If it be, as contended by the bank, that notwithstanding the broad clause in the contract providing for the sale of all the "A T" cattle that it was nevertheless contemplated and understood that the bank should be required to deliver only those subject to its mortgage and not all, then that would be a matter of defense which the bank must have availed itself of by proper pleading and evidence supporting it. Certainly it was not incumbent upon the Duprees, under their contract, for them to show the number of cattle which it was judicially determined were subject to the bank's mortgage by a judgment which was not binding upon them. By a proper pleading, supported by competent testimony, the bank would have the right to show that, notwithstanding the terms of the written contract provided for the sale and delivery of all of the "A T" cattle, the true contract was that they were to deliver only those subject to its mortgage. In order to authorize this testimony, the bank would have to show itself entitled to do so under some of the exceptions to the rule which forbids the introduction of parole testimony to vary or contradict the terms of a written contract.

Reversed and remanded.